# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF WISCONSIN

ALFONSO MORALES and
DAVID KOLATSKI,

Plaintiffs,

v.

POLICE CHIEF ARTHUR JONES,
and DEPUTY MONICA RAY,

Defendants.                                    No. 00-CV-0618-DRH


## MEMORANDUM and ORDER

HERNDON, District Judge:

### I.  Introduction and Background

Pending before the Court are Defendants' motions for judgment as a matter of law, for new trial and for amended judgment (Doc. 130) and Plaintiffs' motion for attorney's fees and costs (Doc. 126).  Based on the pleadings, the applicable law and the following, the Court denies Defendants' motions and grants in part and denies in part Plaintiffs' motion.

Back in May 2000, Alfonso Morales and David Kolatski, former police officers with the City of Milwaukee Police Department, filed suit against Chief Arthur L. Jones, Deputy Chief Monica Ray and the City of Milwaukee for violations of their First Amendment Rights (Doc. 1).

On January 18, 2005, after a four day trial, the jury returned a special

Case 2:00-cv-00618-DRH   Filed 02/01/06   Page 1 of 25   Document 138

verdict in favor of Plaintiffs Alfonso Morales and David Kolatski and against Defendants Chief Arthur L. Jones and Deputy Chief Monica Ray (Doc. 120). The jury awarded both Morales and Kolatski $20,000 in compensatory damages and $65,000 in punitive damages. The Clerk of the Court entered judgment reflecting the same on November 21, 2005 (Doc. 121).

## II.  Defendants' Motions

When entertaining a motion for judgment as a matter of law, the court should review all of the evidence in the record. *Reeves v. Sanderson Plumbing Products, Inc.,* **530 U.S. 133, 150 (2000)**. In doing so, the court must draw all inferences in favor of the nonmoving party, here Morales and Kolatski. *Id.; Gustafson v. Jones,* **290 F.3d 895, 906 (7th Cir. 2002).** The court may not make credibility determinations or reweigh the evidence; it must disregard all evidence favorable to the moving party that the jury is not required to believe. *Reeves,* **530 U.S. at 150-51**. "That is, the court should give credence to the evidence favoring the nonmovant as well as that evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses." *Reeves,* **530 U.S. at 151 (internal quote marks omitted)**. The Court must be particularly careful in employment discrimination cases to avoid supplanting its view of the credibility or weight of the evidence for that of the jury. *Hybert v. Hearst Corp.,* **900 F.2d 1050, 1054 (7th Cir. 1990). *See also Tuohey v. Chicago Park Dist.,* 148 F.3d 735, 740 (7th Cir. 1998) (noting**

**we are particularly careful in employment discrimination cases not to substitute our own view of credibility or weight of the evidence for that of the jury**). This is because employment discrimination cases often involve sensitive and difficult issues of fact, and plaintiffs often have only circumstantial evidence on which to rely. *Hybert,* **900 F.2d at 1054**.

A district court may grant judgment as a matter of law where "there is no legally sufficient evidentiary basis for a reasonable jury to find for" the prevailing party. *Honaker v. Smith,* **256 F.3d 477, 484 (7th Cir. 2001)**. The court may set aside the jury's verdict and enter judgment as a matter of law only when, without resolving conflicts in the testimony or otherwise considering the weight of the evidence, the evidence is such that a reasonable jury could reach only one conclusion. *Lane v. Hardee's Food Systems, Inc.*, **184 F.3d 705, 706-07 (7th Cir. 1999);** *Klunk v. County of St. Joseph,* **170 F.3d 772, 775 (7th Cir. 1999); see generally** *Anderson v. Liberty Lobby, Inc.,* **477 U.S. 242, 250-51(1986) (same standard applies for summary judgment and judgment as a matter of law)**. The evidence in support of the verdict must be substantial. *Honaker,* **256 F.3d at 484**. In ruling on a motion for new trial, the court must determine whether "the verdict is against the weight of the evidence ... the damages are excessive, or ... for other reasons, the trial was not fair to the party moving." *General Foam Fabricators, Inc. v. Tenneco Chemicals, Inc.*, **695 F.2d 281, 288 (7th Cir. 1982)**.

Case 2:00-cv-00618-DRH   Filed 02/01/06   Page 3 of 25   Document 138

**A. Judgment in favor of Morales and against Chief Jones**

Defendants argue that Morales' Judgment against Chief Jones must be reversed as there was insufficient evidence on the issue of causation. Chief Jones claims that he did not know of Morales' disclosure to the District Attorney's office which started the investigation into Chief Jones and Deputy Chief Ray. Further, Chief Jones argues that he had no knowledge of Morales' December 8, 1998 deposition and that based on the case law the length of time from April 8, 1998 to Morales' transfer on January 22, 1999 is too long of a period to connect his retaliatory motive to the transfer.

Based on the record, the Court finds that Morales presented legally sufficient evidence for a reasonable jury to find that Chief Jones knew of Morales' disclosure to the District Attorney's office which started the investigation into Chief Jones and Deputy Chief Ray for harboring a wanted felon, Vincent Ray, and that Chief Jones did know of Morales' December 8, 1998 deposition. As of March 22, 1998, both Chief Jones and Deputy Chief Ray knew about Morales and Detective Link's efforts to investigate an allegation that Vincent Ray was fortifying an apartment and selling drugs from there. Lt. Edward Liebrecht testified that after he received a complaint by the apartment's owner that Vincent Ray was selling drugs from an apartment, he assigned Link and Morales to investigate the complaint. Furthermore, Link testified that he and Morales were ordered by Lt. James Shepard to drop every investigation they were conducting and make the Vincent Ray investigation their top priority pursuant to orders from the "Chief." Link also testified that Lt. Shepard

Page 4 of 25

ordered him to put together a "Matter Of" report detailing every aspect of their investigation into Vincent Ray and to provide Lt. Shepard with the report who would then forward the information up the chain of command to Chief Jones.[1] Lt. Shepard testified that he forwarded Detective Link's Matter Of report up the chain of command to Chief Jones on Sunday, March 22, 1998. Moreover, Morales and Detective Link testified that every time between March 22, 1998 and April 6, 1998 that the received a lead on where Vincent Ray was they would report the lead to their supervisor and that Vincent Ray would be absent at the planned meetings.

Moreover, there is evidence that on April 6, 1998, the date of Vincent Ray's arrest, Morales, Detective Link and Kolatski all spoke to Lt. Habeck who was in direct communication with Deputy Chief Ray about the arrest of her brother. Further on April 8, 1998, Morales was summoned to a meeting with Deputy Chief Ray, Captain Sucik, and Detective Link. At this meeting, Deputy Chief Ray questioned Morales as to the following areas: (1) how the District Attorney's investigation as to herself and Chief Jones began; (2) what information was given to the District Attorney's office; and (3) how Morales got that information. Specifically, Morales told Chief Deputy Ray that Kolatski learned from the owner of the Gold Rush Chicken restaurant that he saw Deputy Chief Ray, Vincent Ray and Chief Jones at Deputy Chief Ray's home when he delivered chicken to her house. Morales also told Deputy Chief Ray that he informed the District Attorney that she ordered Lt.

---

[1]The Matter Of report was Exhibit 1 at trial.

Case 2:00-cv-00618-DRH   Filed 02/01/06   Page 5 of 25   Document 138

Habeck on the evening of April 6, 1998 to keep her name out of all arrest reports; and that if Vincent Ray gave the same address as her address that his address should be changed to any other address even if that meant changing it to a "f------ street pole." Morales also told Chief Deputy Ray that on the morning of April 7, 1998 when he delivered the arrest reports to the District Attorney, the Assistant District Attorney noticed that the pedigree reports were missing and began asking questions about the reports whereabouts. Morales then informed Deputy Chief Ray that after he told the Assistant District Attorney the above information the Assistant District Attorney became concerned. Morales then told Deputy Chief Ray that based on all of those allegations, the District Attorney's office began an investigation into Deputy Chief Ray and Chief Jones for potentially harboring a known felon, Vincent Ray.

Also during this meeting, Deputy Chief Ray notified everyone present that she was going to contact her attorney and Chief Jones about these allegations. Deputy Chief Ray testified that she told Chief Jones about all that she learned at this meeting. In addition, Chief Jones testified that he had a conversation with Deputy Chief Ray and that he knew that the District Attorney's office was going to conduct interviews of himself and Deputy Chief Ray that same day.

The evidence also reveals that Deputy Inspector Schunk, the head of Internal Affairs, met with Chief Jones on April 8, 1998. Chief Jones told Deputy Inspector Schunk that Deputy Chief Ray's brother was arrested and that the officers involved were at a chicken restaurant where the owner stated that he delivered chicken to Deputy Chief Ray's home, that a man with a tattoo answered the door and

that Chief Jones was standing behind him. An April 8, 1998 memo written by Deputy Inspector Schunk states the same. Deputy Inspector Schunk testified that Chief Jones wanted him to begin an investigation into the officers for discussing business at the chicken restaurant. Deputy Inspector Schunk also testified that when he had the meeting with Chief Jones, he thought that they both knew who the involved officers were. Furthermore, on April 17, 1998, Deputy Inspector Schunk interviewed Mullarkey, the chicken restaurant owner, who gave descriptions of Kolatski, Link and Morales.

The evidence also demonstrates that on April 14, 1998, Deputy District Attorney Reddin received a call from Chief Jones in the early evening. During this conversation, Chief Jones expressed that he was upset because the District Attorney's office had made inquiries as to whether Chief Jones was at Chief Deputy Ray's house at a time when Vincent Ray was there and wanted on outstanding warrants. Subsequently, on April 17, 1998, Kolatski was transferred from the Vice Control Division to night shift district patrol duty.

The evidence also shows that Chief Jones was aware of Morales' December 8, 1998 deposition in the Kuchenreuther case. Deputy Chief Ray stated that a City Attorney asked her why Kolatski was transferred from Vice Control. Similarly, Kolatski testified during his Kuchenreuther deposition that he believed that he was transferred in retaliation for events surrounding the Vincent Ray arrest. Also, during Detective Link's December 8, 1998 deposition in the Kuchenreuther case, Detective Link testified that he thought that Kolatski was transferred in

retaliation for events relating to the Vincent Ray arrest.

Further, the evidence shows that Morales' January 22, 1999 transfer happened unexpectedly and that there was no documentation setting forth any legitimate reason for the transfer. Morales was on the Vice Control entry team which was a specialized unit within the Vice Control Division that required the department to make extensive payments for the extensive training. Further, Morales is a Spanish speaking officer whose usefulness to the Vice Control Division in its war on drugs was an essential element. Further, the evidence shows that Morales was performing his duties well at the time of the transfer.

Deputy Chief Ray testified that Morales was transferred because of a reconfiguration of the Vice Control Division, because he placed high on a detective's test and he would have been ultimately transferred in any event. However, Captain Sucik and Lt. Liebrecht both testified that although reconfiguration of the Vice Control Division was being discussed in the latter part of 1998 and the early part of 1999, there was never any discussion that any officer within the division would be transferred out of the division. In fact, these officers testified that the reconfiguration would require additional officers to be assigned to the Vice Control Division. Furthermore, Chief Jones testified that he had no explanation or knew of no reason for why Morales was transferred on January 22, 1999. Not one witness testified that they had knowledge of any person ever being transferred out of Vice Control Division as a police officer because they ranked high on a detective's test and would be transferred in a short time in any event.

Additionally, the record shows that Chief Jones was upset with the District Attorney's investigation. The record demonstrates that based on Detective Link's assignment to the Prostitution Unit within days of his December 8, 1998 deposition, an assignment that Detective Link stated was the worst assignment he had within the Milwaukee Police Department, together with Kolatski's prior transfer and Chief Jones' prior agitation regarding the District Attorney's investigation, there is enough evidence for a reasonable jury to find that Chief Jones was angry enough to transfer Morales based on the conversations Morales had with the District Attorney's office and his December 8, 1998 deposition in the Kuchenreuther case. Thus, the Court denies Defendants' motion as to this request.

**B. Judgment in favor of Kolatski and against Chief Jones**

Defendants also argue that Kolatski's Judgment against Chief Jones must be reversed as there is insufficient evidence to sustain the verdict. Chief Jones argues that he had no knowledge of Kolatski's involvement with the chicken man. Based on the record, the Court finds that Kolatski presented legally sufficient evidence for a reasonable jury to find that Chief Jones knew of Kolatski's involvement in providing information concerning the chicken delivery made to Deputy Chief Ray's home wherein Chief Jones, Deputy Chief Ray and Vincent Ray were all present.

The evidence reveals that on April 8, 1998, Morales specifically told Deputy Chief Ray that it was Kolatski who learned from the owner of Gold Rush Chicken that a couple of weeks earlier he delivered chicken to Deputy Chief Ray's

Case 2:00-cv-00618-DRH   Filed 02/01/06   Page 9 of 25   Document 138

home and at that time Chief Jones and Vincent Ray were also present. Thereafter, Deputy Chief Ray called Chief Jones on April 8, 1998 and told him about all the information given to the District Attorney's office. She also told him how the information was learned and who provided the information. That same day, Chief Jones met with Deputy Inspector Schunk to initiate an Internal Affairs Division investigation because Deputy Chief Ray's brother had been arrested and the officers involved had a conversation with the owner of a chicken restaurant who informed the officers that when he delivered chicken to Deputy Chief Ray's home Chief Jones, Deputy Chief Ray and a man meeting Vincent Ray's description was there. Also, Chief Jones testified that there was a possibility that the names of the officers were mentioned in his meeting with Deputy Inspector Schunk, but he did not know for sure. While Schunk testified that in this meeting with Chief Jones on April 8, 1998, he thought that they both knew who the officers were. Moreover, the arrest report of Vincent Ray, Trial Exhibit 6, lists Kolatski as the assisting office to the arresting officer Morales.

In addition, the record shows that on April 17, 1998, Kolatski's transfer date, Schunk interviewed the owner of the chicken restaurant who gave descriptions of the three officers. These descriptions were similar to those of Kolatski, Link and Morales. Schunk verified this in his testimony.

Furthermore, the evidence demonstrates that Kolatski's transfer was unexpected, that there was no legitimate reason for the transfer, that there was no documentation explaining his transfer, that he was performing his job well and that

his usefulness to the unit was not completed. In addition, Captain Sucik testified that he knew of no reason for why Kolatski was transferred and that had it been his decision Kolatski would have remained a member of the Vice Control Division. Lts. Liebrecht, Habeck, and Shepard testified to the same. In fact, Chief Jones stated that he knew of no reason why Kolatski was transferred on April 17, 1998.

Deputy Chief Ray was the only person to testify as to why Kolatski was transferred. Deputy Chief Ray testified that after conversing with Chief Jones she decided to transfer Kolatski because Kolatski and Deputy Chief Ray's administrative assistant had an argument over the use of the administrative assistant's phone. Deputy Chief Ray admitted that she did not investigate the facts surrounding the phone incident. Deputy Inspector Schunk testified that under these facts an officer/employee would not be transferred. Also, Captain Sucik testified that he knew about the incident with the phone; that he told Kolatski not to use the phone anymore and that one incident would not have resulted in Kolatski's transfer. Similarly, Lts. Liebrecht, Habeck and Shepard all testified that this incident would not have resulted in a transfer. Moreover, Sucik, Liebrecht, Habeck, and Shepard all described Kolatski's use of the phone as proper protocol for members of the Vice Control Division.

Based on the evidence a reasonable jury could have found that Chief Jones would have been motivated to transfer Kolatski based on the information he learned from the owner of the chicken restaurant which Morales supplied to the District Attorney. In fact, Deputy District Attorney Reddin testified that Jones was

Case 2:00-cv-00618-DRH   Filed 02/01/06   Page 11 of 25   Document 138

quite upset over the investigation into himself based on the chicken owners's allegations. Thus, the Court denies Defendants' motion as to Kolatski's judgment against Jones.

## C. Judgment in favor of Morales and against Deputy Chief Ray

Defendants also argue that the verdict in favor of Morales and against Deputy Chief Ray should be set aside as supported by insufficient evidence. Specifically, that the statements that Morales made to Deputy Chief Ray happened approximately nine months before his January 22, 1999 transfer and that she did not know of his December 8, 1998 deposition.

As stated supra, the evidence establishes that Deputy Chief Ray informed Chief Jones about all the information concerning her brother's arrest and who provided it to the District Attorney's office. In fact, Deputy Chief Ray was so concerned that she hired a personal attorney who went with her to be interviewed by the District Attorney. The evidence also revealed that Deputy Chief Ray admitted she was asked by a City Attorney following the Kolatski deposition on December 8, 1998 as to why Kolatski was transferred from the Vice Control Division. Moreover, it is possible that a reasonable jury did not believe Deputy Chief Ray's explanation as to why Morales was transferred. Based on the evidence, a reasonable jury could have found that Deputy Chief Ray knew of Morales' December 8, 1998 deposition and had a hand in causing Morales to be transferred on January 22, 1999. Thus, the Court denies Defendants' motion as to this issue.

## D. Judgment in favor of Kolatski and against Deputy Chief Ray

Defendants argue that the verdict in favor of Kolatski and against Deputy Chief Ray cannot stand. In particular, Defendants contend that Deputy Chief Ray did not know that it was Kolatski who learned of the chicken restaurant owner's allegations or that he provided the information to Morales.

As stated previously, the evidence shows that on April 8, 1998, Morales was summoned to a meeting with Deputy Chief Ray. In that meeting Morales testified that Deputy Chief Ray questioned him regarding what information was given to the District Attorney, how that information was learned, and what the District Attorney's office was going to do with that information. In response to the questions, Morales informed Deputy Chief Ray that Kolatski was the person who learned of the chicken restaurant owner's allegations that he had delivered chicken to her house and at that time her, Chief Jones and Vincent Ray were present. Moreover, it is possible that a reasonable jury did not believe Deputy Chief Ray's explanation as to why Kolatski was transferred. Based on the evidence, a reasonable jury could have found that Deputy Chief Ray knew that Kolatski talked to the chicken restaurant owner. Therefore, the Court denies Defendants' motion as to this issue.

### E. Qualified Immunity

Next, Defendants argue that they are entitled to judgment as a matter of law because Plaintiffs' speech was not protected, therefore, they are entitled to qualified immunity. Specifically, Defendants maintain that the Plaintiffs' speech is not protected as these incidents were required job duties or casual chit-chat. The Court does not agree.

Case 2:00-cv-00618-DRH   Filed 02/01/06   Page 13 of 25   Document 138

The Supreme Court has held that the speech of a government employee warrants First Amendment protection if that speech "addresses a matter of public concern." ***Connick v. Myers,* 461 U.S. 138, 147 (1982)**. Whether the employee's speech constitutes public concern must be determined "by the content, form, and context of a given statement, as revealed by the record as a whole." ***Id.* at 147-48**. The Seventh Circuit has determined that the content of the speech is the most important. ***See Campbell v. Towse*, 99 F.3d 820, 827 (7th Cir. 1996); *Glass v. Dachel*, 2 F.3d 733, 740 (7th Cir. 1993)**.

The Court must also seek "a balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of public service." ***Connick*, 461 U.S. at 142 (quoting *Pickering v. Board of Education,* 391 U.S. 563, 568 (1968))**. "In terms of content, this court has determined that police protection and public safety are generally a matter of public concern." ***Delgado v. Jones*, 282 F.3d 511, 517 (7th Cir. 2002)(citing *Auriemma v. Rice,* 910 F.2d 1449, 1460 (7th Cir. 1990) (*en banc*) ("It would be difficult to find a matter of greater public concern in a large metropolitan area than police protection and public safety."); *Glass,* 2 F.3d at 741 ("Obviously, speech that focuses on police departments (and ultimately police protection and public safety) involve matters of great public concern.")**.

Here, the Court finds that Kolatski's relaying of information to Morales

Case 2:00-cv-00618-DRH   Filed 02/01/06   Page 14 of 25   Document 138

concerning the chicken restaurant owner's allegations that there was a possibility that Chief Jones and Deputy Chief Ray were in the presence of a known felon and thereby harboring that known felon was protected speech. It was a matter of public concern; it was a communication by a law enforcement officer that contained information essential to a complete and objective investigation of serious criminal activity which is consider to be "content" that implicates public concern. This speech was also information regarding potential misconduct on behalf of Chief Jones and Deputy Chief Ray for harboring a known felon which is a violation of state law, serious in nature and directed at the heads of the Milwaukee Police Department. **See Spiegla v. Hull, 371 F.3d 928, 937 (7th Cir. 2004) ("Unscrupulous public employees may find ways to exploit the resources and opportunities available to them through their offices. Perhaps the public's best protection against these few wayward individuals is the insider who is willing to speak up and shed light on her colleagues' improprieties. Recognizing the "whistleblower's" important role, our cases have consistently held that speech alleging government corruption and malfeasance is of public concern in its substance)(citations omitted)**. Similarly, the Court finds that Morales' informing the District Attorney's office of the allegations is protected for the same reasons. Additionally, Morales' testimony in his December 8, 1998 as to why Kolatski was transferred is an opinion that cannot be tied to any required duty of his position as a police officer and, thus, that speech is protected as well. Moreover, the Court finds that Kolatski's statements

Case 2:00-cv-00618-DRH   Filed 02/01/06   Page 15 of 25   Document 138

to Link and Morales were not idle chit-chat. In fact, these statements concern allegations that potentially implicated Chief Jones and Deputy Chief Ray in criminal activity and the fact that Chief Jones and Deputy Chief Ray were the heads of the Milwaukee Police Department made that speech a matter of public concern.

Additionally, Kolatski's speech to Morales about the chicken restaurant owner is protected speech and not part of required job duties. It had no usefulness in Vincent Ray's prosecution but it was volunteered information needed for a complete investigation into the potential serious criminal misconduct of Defendants.

Furthermore, as the Seventh Circuit stated in **Delgado, 282 F.3d at 520**, a qualified immunity analysis involves whether the law was "clearly established" at the time of the alleged violation. "In *Gustafson*, this court observed, "It has been well established for many years in this Circuit that a public employer may not retaliate against an employee who exercises his First Amendment speech rights, including in particular retaliation through a transfer to a less desirable position." 117 F.3d at 1020. … Although the defendants argue that *Gonzalez* somehow altered the First Amendment landscape in this Circuit, the alleged retaliation against Delgado occurred about eight months before our decision in *Gonzalez*, eliminating any possibility of reliance." **Id**. Thus, the same applies to the case at bar. Defendants' reliance on **Garcetti v. Ceballos** and **Gonzalez v. Chicago** is irrelevant. The retaliation against Morales and Kolatski occurred approximately two years in advance of the **Gonzalez** decision and over six years in advance of a decision

Case 2:00-cv-00618-DRH   Filed 02/01/06   Page 16 of 25   Document 138

that has yet to be decided by the Supreme Court in ***Garcetti v. Ceballos***. Therefore, the Court finds that Defendants are not entitled to qualified immunity. Accordingly, the Court denies Defendants' motion based on qualified immunity.

### F. Compensatory Damages

Defendants contend that the compensatory damages awarded to each of the Plaintiffs are excessive. Defendants contend that there is no evidence that either Morales or Kolatski had been subjected to public statements by either Jones or Ray regarding their transfers. Further, Defendants contend that Plaintiffs did not substantiate their emotional distress. The Court does not agree.

The Court may grant Defendants a new trial based on the excessiveness of the jury's award only if the award is "monstrously excessive" or the award has no rational connection to the evidence, indicating that the award was "merely a product of the jury's fevered imaginings or personal vendettas." ***EEOC v. AIC Sec. Investigations, Ltd.***, **55 F.3d 1276, 1285 (7th Cir. 1995); accord *Kapelanski v. Johnson*, 390 F.3d 525, 532 (7th Cir. 2004); *DeBiasio v. Illinois Central Railroad*, 52 F.3d 678, 687 (7th Cir. 1995)**. A remittitur rather than a new trial may be more appropriate when a party seeks to establish the need for a new trial based on the size of the verdict. ***See Davis v. Consolidated Rail Corp.***, **788 F.2d 1260, 1263 (7th Cir. 1986)("Only in an unusual case will a court order a new trial on liability because of an error in assessing damages or in apportioning them among multiple defendants.").**

Here, the Court finds that Defendants have not shown that the awards are monstrously excessive or that the awards have no rational connection to the evidence. Defendants' argument ignores testimony regarding Plaintiffs' mental anguish, anxiety, sleeplessness, stress, marital hardship and loss of self esteem. These factors combined can establish the loss each Plaintiff suffered from which a jury could gauge the personal indignity suffered as a result of Defendants' actions. Further, the jury could arrive at an estimation of each of the Plaintiffs' loss, by comparing the circumstances of their lives before and after the transfers. The $20,000 award is also not excessive in comparison to awards in similar cases. For example, in **Gustafson v. Jones, 290 F.3d at 899**, a case very similar to this one, an award of $10,000 in compensatory damages and $180,000 in punitive damages was upheld. **See also EEOC v. AIC Security Investigations, Ltd., 55 F.3d 1276, 1286 (7th Cir. 1995)("Comparability of awards must be adjusted for the changing value of money over time.")**. Because the Court finds that the compensatory damages awarded to Plaintiffs had a rational connection to the evidence and were not excessive, the Court denies Defendants' request for a new trial or remittur on the issue of compensatory damages.

### G. Punitive Damages

Defendants also argue that the Court should set aside the jury's award of punitive damages because there was not clearly established law prohibiting the transfer of any employee based on statements the employee might make as part of

Case 2:00-cv-00618-DRH   Filed 02/01/06   Page 18 of 25   Document 138

their regular job duties. Defendants also argue that the awards are excessive. Additonally, Defendants contend that there was no evidence of public condemnation of either of the Plaintiffs by either of the Defendants; there was no evidence of any efforts to terminate or suspend either of the Plaintiffs; and there was no evidence of any other actions by either of the Defendants against either of the Plaintiffs other than the transfers. The Court rejects Defendants' arguments.

The Supreme Court directed courts reviewing punitive damage awards to consider three guides: (1) the degree of reprehensibility of the conduct; (2) the disparity between the actual harm suffered and the punitive damage award; and (3) the difference between the punitive damages awarded and penalties imposed in similar cases. *BMW of North America v. Gore,* **517 U.S. 559, 575 (1996)**. The Supreme Court has recognized that there are limits on acceptable punitive damage awards and that "in practice, few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process." *State Farm Mut. Auto. Ins. Co. v. Campell,* **123 S.Ct. 1513, 1524 (2003)**.

As to the established law argument, the Court finds that as of 1998, the Defendants knew that they were violating a clearly established right when they transferred Plaintiffs for their speech which resulted in the District Attorney's investigation into the Defendants' potential misconduct for harboring a felon. It was established by 1998 that to transfer employees in retaliation for their speech to less

desirable assignments was in violation of the First Amendment. **See *Gustafson v.***
***Jones*, 117 F.3d 1015, 1020 (7th Cir. 1997)**.

In this case, the jury awarded plaintiffs punitive damages of $65,000,
with compensatory damages of $20,000. In 2002, in a similar case, the Seventh
Circuit did not disturb punitive damages of $180,000 and compensatory damages
in the amount of $10,000. **See *Gustafson*, 290 F.3d at 899**. ***Gustafson*** was the
first case in which Defendant Jones was found to have retaliatorily transferred police
officers in violation of their amendment rights. The Plaintiffs in the case at bar
received considerably less punitive damages than the Plaintiffs in ***Gustafson***.
Further, Plaintiffs point out that the ratio of punitive damages to compensatory
damages is 3.5 to 1. Plaintiffs claim, and the Court agrees that the "modest ration
of punitive damages awarded by the jury clearly falls within the single-digit
multipliers, in accord with the tradition of double and treble damages, allowed by
the Supreme Court." ***Campell*, 123 S.Ct. at 1524**. Accordingly, the Court will
uphold the jury's award of punitive damages and deny Defendants' motion as to the
punitive damages.

### H. Verdict Form as to Punitive Damages

Lastly, Defendants argue that over their objection, the Court erroneously
provided the jury with a verdict form that was phrased in a manner of asking the jury
whether it would award a certain sum to each plaintiff, rather than assessing punitive
damages against each of the individual defendants. Because the Court is upholding

Case 2:00-cv-00618-DRH   Filed 02/01/06   Page 20 of 25   Document 138

the jury verdict in all respects, the Court denies this request.

### III.  **Plaintiffs' Motion for Attorney's Fees and Costs**

Plaintiffs' counsel moves for attorney fees and costs in this matter.  In particular, Plaintiffs' counsel moves for attorney hours of 479.80 at $350 per hour rate for himself and paralegal hours of 162.30 at $120 per hour rate for his paralegal arguing that these amounts are reasonable as they reflect the prevailing market rates. In all, Plaintiffs request reimbursement of $187,406 for all attorney and paralegal fees as incurred through this motion, together with expenses of $7,398.93 for a total of $194,804.93.  Defendants respond that the hours claimed are excessive as are the hourly rates claimed.  Defendants contend that the reasonable loadstar fees and costs should be 394.1 attorney hours at $187 per hour: $73,696.70 plus $7,398.98 in costs.  Defendants also contend that if paralegal services are included it should be 120.5 hours at $75 per hour: $9,037.50.  Based on the following the Court grants in part and denies in part Plaintiffs' request for fees and costs.  Specifically, the Court finds that the hours are not excessive and that Plaintiffs' counsel is entitled to $200 per hour and his paralegal is entitled to $75 per hour.

In federal court, a prevailing party is entitled to recover "costs other than attorneys' fees ⋯ as of course."  **Fed.R.Civ.P. 54(d)**.  Under **42 U.S.C. § 1988**, a prevailing party in a § 1983 action may also recover "a reasonable attorney's fee as part of the costs."  Courts use the well-known "lodestar" method to determine a reasonable amount of fees.  ***E.g., People Who Care v. Rockford Bd. of Educ.,*** **90**

Case 2:00-cv-00618-DRH   Filed 02/01/06   Page 21 of 25   Document 138

F.3d 1307, 1310 (7th Cir. 1996); *Hensley v. Eckerhart,* 461 U.S. 424, 433-37,

**(1983)**. Under this method, the court first determines the "lodestar" by multiplying

the hours reasonably expended on the case by a reasonable hourly rate. *People Who*

*Care,* **90 F.3d at 1310**. The court may then adjust this award based on various

factors, *see id.* **at 1310 n. 1**, the "most critical" of which is the degree of success

obtained by the movant, *Hensley,* **461 U.S. at 436**. The movant bears the initial

burden of documenting its fees to the satisfaction of the court; once it has done so,

those fees are presumptively appropriate unless challenged by the opposing party.

*Tomazzoli v. Sheedy,* **804 F.2d 93, 96 (7th Cir. 1986)**.

Looking at the documents supplied by Plaintiffs' counsel as to the hours,

the Court finds that they are reasonable. The Court finds that the hours Plaintiffs'

counsel spent on preparing for depositions are fair as two of the depositions were of

Jones and Ray and the other was Dale Schunk, the commander of the Internal

Affairs Division; these are crucial witnesses to Plaintiffs' case. The Court also finds

that the paralegal's attendance at the depositions to be appropriate as Plaintiffs'

counsel is a solo practitioner. Next, Defendants object to Plaintiffs' counsel's 45.2

hours summarizing the depositions arguing that this is paralegal work and should

be billed at that rate. The Court does not agree with Defendants' position as it is not

illogical or unheard of for a solo practitioner to summarize depositions. Further, the

Court concludes that the hours Plaintiffs' counsel expended to respond to the

summary judgment motion to be reasonable as the proposed finding of facts were

Case 2:00-cv-00618-DRH   Filed 02/01/06   Page 22 of 25   Document 138

49 pages and the response brief was 29 pages. Because the Defendants have not demonstrated that Plaintiffs' counsel's hours need to be reduced, the Court finds that the hours presented by Plaintiffs' counsel and his paralegal are reasonable.

Next, the Court must address whether Plaintiffs' counsel's requests for $350 per hour for his services and $120 per hour for paralegal services are reasonable. Defendants object to these rates and urge the Court that $187 per hour for Plaintiffs' counsel's services and $75 per hour for paralegal services are reasonable. Based on the pleadings submitted by the parties, the Court finds that Plaintiffs' counsel does not make his case for $350 per hour for his services nor for$120 per hour for his paralegal's services and finds that an appropriate market rate per hour is $200 for his services and $75 for the paralegal's services.

Here, there was neither a fee contract nor an agreement submitted. Further, Plaintiffs' counsel's affidavit establishes that his hourly rates are $150 per hour for labor and labor related work for the Wisconsin Professional Police Association and the Milwaukee Police Supervisor's Organization. His affidavit also shows that his hourly rate is $200 "for various plaintiff litigation and business transactions." He does not attest to ever charging or receiving $350 per hour in any matter. The request for $350 per hour is not supported by either Plaintiffs' counsel's billing practices or by the attorney affidavits he submitted: (1) Walter Kelly and (2) John Fuchs.[2] Both affidavits suggest an amount of $250 per hour as a reasonable

[2]Kelly's affidavit states: "..., I have formed the conclusion that in the Milwaukee area, a practitioner with qualifications and experience similar to Attorney Rettko would charge in the range of $250 per hour to $350 per hour for representation in cases of this sort." (Kelly Affidavit,

Case 2:00-cv-00618-DRH   Filed 02/01/06   Page 23 of 25   Document 138

amount for Plaintiffs' counsel. However, the affidavits doe not describe $250 as the prevailing rate. On the other hand, Defendants have submitted a survey for the Economics of Law section of the Wisconsin Bar. The May 2005 survey obtained data from the Milwaukee area broken down by practice area. The 2005 survey revealed that rates between $120 per hour to $250 per hour for similar work. Only two of the eight responses indicated $250 an hour. The median hourly rate is $177. Taking into consideration the **_Johnson/Hensley_** factors, the Court finds that a reduction in the hourly rates requested by Plaintiffs' counsel is appropriate. The same applies to the paralegal's rate per hour. A 2005 survey of Wisconsin firms reveals that the median market rate for legal assistant billing rates is $75 per hour, regardless of experience. Thus, the Court finds that a reasonable hourly rate for Plaintiffs' counsel is $200 per hour and that a reasonable hourly rate for the paralegal is $75 per hour.

Thus, the fee award will reflect (1) $95,960.00 for work billed by Plaintiffs' counsel (479.8 hours multiplied by $200); (2) $12,172.50 for work billed by the paralegal (162.30 hours multiplied by $75) and (3) $7,398.93 in costs. Accordingly, Plaintiffs are entitled to an award of attorney's fees and costs pursuant to **42 U.S.C. § 1988** in the amount of $115,531.43 ($95,960.00 + $12,172.50 + $7,398.93).

### IV. Conclusion

Accordingly, the Court **DENIES** Defendants' motions for judgment as

---

p. 2, ¶ 4).

Case 2:00-cv-00618-DRH   Filed 02/01/06   Page 24 of 25   Document 138

a matter of law, for new trial and for amendment of judgment (Doc. 130).  Further,

the Court **GRANTS in part** and **DENIES in part** Plaintiffs' motion for attorney's fees

and costs (Doc. 126).  The Court **AWARDS** Plaintiffs $115,531.43 in attorney's fees

and costs.

      **IT IS SO ORDERED.**

      Signed this 1st day of February, 2006.


                        /s/        David RHerndon
                        United States District Judge

Case 2:00-cv-00618-DRH   Filed 02/01/06   Page 25 of 25   Document 138